UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANDREY PROKHOROV, individually and
on behalf of all others similarly
situated,

                Plaintiff,

          v.

IIK TRANSPORT, INC. and IVAN
KAZNIYENKO,

                Defendants.

No. 20 CV 6807

Judge Manish S. Shah

MEMORANDUM OPINION AND ORDER

Plaintiff Andrey Prokhorov worked as a truck driver for defendant IIK Transport. He alleges that IIK took deductions from drivers' pay and failed to reimburse drivers' work expenses in violation of the Illinois Wage and Payment Collection Act. He says IIK did this by misclassifying drivers as independent contractors, who are not protected by the Act. He sued IIK Transport and its president, Ivan Kazniyenko, on behalf of himself and all other IIK drivers who were classified as independent contractors. He now moves to certify the class. For the reasons discussed below, the motion is granted.

## I.  Legal Standard

On a motion for class certification under Rule 23, "[t]he party seeking certification bears the burden of demonstrating that certification is proper by a preponderance of the evidence." *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015). If there are material factual disputes that bear on the requirements for

class certification, I must resolve those evidentiary disputes before deciding whether to certify the class. *Id.* at 377 (citing *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001)). Class-certification proceedings are not a "dress rehearsal for the trial on the merits," so I can only evaluate evidence to decide whether certification is proper. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).

## II. Facts

Plaintiff Andrey Prokhorov was a delivery driver for trucking companies IIK and 11K from August 31, 2018, to June 2020. [17] ¶ 4.[1] He was classified as an independent contractor. [17] ¶ 4. Prokhorov was interviewed by defendant Ivan Kazniyenko, the owner and president of IIK, at IIK's offices and signed an independent contractor agreement with IIK. [17] ¶ 7, 15.[2] He and the putative class members shared similar job titles, followed the same policies and practices, and performed similar duties. [17] ¶ 38. They were required to drive a company truck with an "IIK Transportation" logo on it; regularly check in with IIK dispatchers to follow their instructions about which loads to haul, where and when to pick up those loads, and which routes to take; comply with the company's strict time constraints for deliveries; and regularly report to IIK staff and the IIK office in Illinois. [17] ¶¶ 18–

---

[1] Bracketed numbers refer to entries on the district court docket and page numbers refer to the CM/ECF header placed at the top of filings. The facts are taken from the amended complaint, [17], and from the parties' exhibits, [72-1]–[72-12]; [75-1]–[75-5]].

[2] Prokhorov named four defendants in his amended complaint: Kazniyenko, IIK, 11K (another trucking company), and Sergii Stetsiuk (the president of 11K). [17]. Plaintiff is only seeking to certify a class of drivers who worked for IIK and Kazniyenko. [72] at n.1. Prokhorov's individual claim against 11K and Stetsiuk is not at issue here, and he does not pursue a class claim against those defendants.

20. They were required to work full-time and weren't allowed to make deliveries for other companies. [17] ¶ 21. If they wanted to take time off, they had to give advance notice; failure to do that could result in discipline or termination. [17] ¶ 35(h).

Defendants dictated the number of hours drivers worked, as well as the distance they drove. [17] ¶ 27. The drivers were required to report to or contact IIK dispatchers every day at a pre-set time determined by IIK, at which point they were provided with their delivery assignments. [17] ¶ 35(b). Management told drivers which loads to pick up, where those loads were located, and by what time each delivery had to be made. [17] ¶ 35(c). Drivers had no discretion over which loads they picked up or delivered or when. [17] ¶ 35(c). In fact, IIK dispatchers told drivers that they'd be immediately fired if they refused to drive a load that had been assigned to them. [17] ¶ 35(i). Drivers had to submit all bills of lading, logbooks, and other paperwork to IIK's office in Illinois. [17] ¶ 36. Defendants approved the wages paid, hours worked, and all related compensation policies. [17] ¶ 28.

Drivers had to buy and carry GPS devices, which allowed IIK personnel to track them throughout the day and night. [17] ¶ 35(e). IIK's dispatchers and supervisors also gave instructions to drivers via phone while they were driving. [17] ¶ 35(e). Before they began their employment, drivers had to submit to drug testing. [17] ¶ 29.

Drivers were paid on a per-mile basis. [17] ¶ 22. Without obtaining consent or even informing the drivers, defendants made deductions from drivers' pay. [17] ¶¶ 23, 35(g). The deductions varied, but included deductions for insurance coverage,

accidents, speeding tickets, and incorrect logs. [17] ¶ 35(g). For example, defendants deducted the following from Prokhorov's pay: $2,500 for an accident, $100 for a ticket, $100 for a cash advance, $40 for insurance, $17.81 for coolant, $200 for fuel, and $8 for logbooks. [17] ¶ 24. Drivers were also charged escrow deposits of $1,000, which defendants deducted from their pay when they began, allegedly to ensure that drivers gave two weeks' notice before leaving. *See* [17] ¶ 25. Defendants didn't reimburse drivers for out-of-pocket expenses they incurred as part of the job, [17] ¶¶ 51–52, including, in Prokhorov's case, payments for cell phone service, repair tools, and GPS services. [17] ¶ 26.

When they first started the job, every driver had to go IIK's offices in Illinois to fill out employment paperwork, go through orientation, do a road test, and pick up their truck from the yard. [72-3] at 18:1-14, 49:15-24. At least ten percent of the cargo drivers carried was delivered to or from customers in Illinois, and drivers spent around thirty percent of their time or more commuting through Illinois. [17] ¶ 33.

Prokhorov, on behalf of himself and a putative class, sued defendants for violations of the Illinois Wage and Payment Collection Act, alleging that defendants made illegal deductions from class members' pay and unlawfully required them to incur expenses that defendants should have reimbursed. [17] ¶ 2 (citing 820 ILCS 115/9, 9.5).[3] Defendants moved to dismiss, [20], and I denied the motion, [25]. Prokhorov now moves to certify a class.

---

[3] Former co-plaintiff Igor Goutsalenko has since died. [31] at 1.

### III.   Analysis

To be certified, a proposed class must meet Federal Rule of Civil Procedure 23(a)'s four requirements: numerosity, commonality, typicality, and adequacy of representation. The class must be "so numerous that joinder of all members is impracticable" (numerosity), there must be questions of law or fact common to the class (commonality), the claims or defenses of the representative parties must be typical of the claims or defenses of the class (typicality), and the representative parties must be able to fairly and adequately protect the class's interests (adequacy). Fed. R. Civ. P. 23(a). Defendants don't contest numerosity and have provided records and interrogatory responses suggesting there are somewhere around 348 putative class members, [72] at 5 (citing [72-4] and [72-6]), more than enough to meet the requirement. *Anderson v. Weinert Enters., Inc.*, 986 F.3d 773, 777 (7th Cir. 2021) (forty-member class often, but not always, sufficient to meet numerosity requirement; key numerosity inquiry isn't about number of class members but about practicability of joinder).[4]

When plaintiffs seek certification under Rule 23(b)(3), they must also meet the rule's predominance and superiority requirements. *Messner*, 669 F.3d at 811. That is, the questions of law or fact common to the class members must predominate over any questions affecting only individual class members, and a class action must be superior

---

[4] Defendants provided a list of drivers, identified by employee number, who worked for IIK in December 2018 or after. That list shows IIK employed 268 drivers in that time. [72-6]. According to defendants, in December 2018, a fire destroyed IIK's office and, along with it, "nearly all of IIK's hard copy records and computer servers." [72-4] at 3–4. IIK therefore doesn't have records of its employees from 2012 to December 2018 and estimates that it employed around 80 drivers in those six years.

to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). In addition to Rule 23's explicit requirements, courts "have long recognized an implicit requirement…that a class must be defined clearly and that membership be defined by objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015).

### A.    The Class Definition

For a class to be "defined clearly," the class definition must be 1) precise, 2) defined by objective criteria (e.g., not state of mind), and 3) not defined by success on the merits (so-called "fail-safe classes"). *Id.* at 659–60. Plaintiff defines the class as, [72] at 2:

> All individuals who worked as delivery drivers for IIK in Illinois between November 2010 and the present and who were classified as independent contractors.

Defendants say this definition is overbroad for two reasons. First, they say the applicable statute of limitations under the Illinois Wage and Payment Collection Act is five years, so claims arising before November 17, 2015, are barred. [75] at 16. Not so. As of 2007, the applicable statute of limitations for "actions brought under the Illinois Wage Payment and Collection Act" is ten years. 735 ILCS 5/13-206 (amended Aug. 16, 2007). The complaint was filed on November 17, 2020. [1]. Plaintiff's definition (drivers who worked for IIK between November 2010 and November 17, 2020) is therefore overbroad by 16 days. This is not a reason to deny class certification. The solution is to "amend the class definition as needed to correct for the overbreadth." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 757 (7th Cir. 2014) (quotations and citation omitted).

6

Second, defendants say the proposed class includes people who have no viable claims against IIK: 16 drivers who defendants say didn't have any deductions taken by IIK, and seven drivers who only had deductions for occupational accident insurance and membership in a drivers legal network, both of which (defendants say) are authorized by written agreements. [75] at 16. Again, this is not a reason to decline to certify the class. "[A] class will often include persons who have not been injured by the defendant's conduct…Such a possibility or indeed inevitability does not preclude class certification." *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009); *see also Messner*, 669 F.3d at 823 ("[T]hat some class members' claims will fail on the merits if and when damages are decided [is] a fact generally irrelevant to the district court's decision on class certification."). The better route is to amend the class definition.

Whether or not I should do that at this stage depends on whether those 23 drivers (16 + 7) are members who *couldn't* have been harmed or members who, the evidence will ultimately show, *weren't* harmed. A good illustration of the difference comes from *Bell v. PNC Bank*. There, plaintiffs alleged that defendant had a company-wide policy of forcing employees to work off-the-clock overtime hours in violation of the Fair Labor Standards Act. 800 F.3d at 365, 375. The FLSA's overtime requirements apply only to non-managerial employees. *See id.* at 380. Managerial employees therefore *could not* have been harmed by the policy, so a class including them would have been overbroad. *Id.* In contrast, all non-managerial employees would remain part of the class definition because it was *possible* that they were

harmed, even if evidence later showed they weren't (either because they hadn't worked overtime or because they'd already been paid for working overtime). *Id.* The same is true here. Any driver could have been harmed by being classified as an independent contractor, assuming they were misclassified. If evidence later shows that no deductions were taken from their wages, or that some of those deductions were proper, that will be addressed at a later stage. "It is routine in class actions to have a final phase in which individualized proof must be submitted." *Chicago Teachers Union, Local No. 1 v. Bd. of Educ.*, 797 F.3d 426, 442 (7th Cir. 2015) (quotations and citation omitted); *see also Bell*, 800 F.3d at 379–80 ("If the class prevails in demonstrating that [defendant] had an unofficial policy or practice that required employees class-wide to work off-the-clock overtime hours, scores of separate trials might be necessary to determine which class members were actually adversely affected by the policy…At least it will not be necessary in each of those trials to determine whether [defendant] had an illegal policy of denying pay for off-the-clock work.").

There are other reasons why excluding these 23 drivers from the class definition doesn't make sense. Even assuming sixteen drivers didn't have deductions taken from their wages, they may still have been adversely affected by improper classification. Plaintiff alleges that defendants decreased drivers' wages with little warning. [75-4] at 140:17-21. He also alleges that drivers weren't reimbursed for necessary expenditures. [17] ¶¶ 26, 51. If those allegations are true, then the alleged

misclassification of the employees as independent contractors may have harmed them even though nothing was deducted from their pay.

Defendants' argument that seven drivers' deductions were authorized by written agreement misses the fact that plaintiff is contesting deductions allegedly authorized by written agreement. If it turns out that drivers should have been classified as employees, and that employees cannot pre-authorize deductions (both merits questions for a later day), then those seven drivers could be entitled to damages on plaintiff's legal theory. For these reasons, the proposed class definition including those drivers is not overbroad.

### B. Commonality

"[E]ven a single common question will do" to fulfill Rule 23's commonality requirement. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (quotations and citation omitted). "The critical point is 'the need for *conduct* common to members of the class.'" *Suchanek*, 764 F.3d at 756 (quoting *In re IKO Roofing Shingle Prods. Liab. Litig.*, 757 F.3d 599, 602 (7th Cir. 2014)). Class members don't need to present identical factual situations. "[W]hat matters is whether there is a common contention whose truth or falsity 'will resolve an issue that is central to the validity of each claim.'" *Johnson v. Diakon Logistics*, 2020 WL 405636, at *4 (N.D. Ill. Jan. 23, 2020), *aff'd*, 44 F.4th 1048 (7th Cir. 2022) (quoting *Chicago Teachers Union, Local No. 1*, 797 F.3d at 434).

The parties' commonality arguments can be sorted into two categories: those related to whether the Act applies, and those related to whether defendants would be liable under the Act assuming it applies. In the first category, defendants say that

there's not common proof about whether the Act applies to each of the drivers. Also in the first category is plaintiff's argument that common proof will provide an answer about whether the drivers were employees or independent contractors. In the second category, defendants say there's not common proof about whether deductions were improper and, to the extent they were, how much each driver is owed. Also in the second category is defendants' argument that there's no common proof about whether drivers were entitled to reimbursements and, if they were, how much each is owed.

### 1. Extraterritoriality

The Illinois Wage and Payment Collection Act "applies to all employers and employees in this State." 820 ILCS 115/1. According to defendants, those last three words—"in this State"—create a commonality issue for plaintiff because deciding whether the different putative class members come within the Act's scope will require individualized inquiries. [75] at 5–7. Defendants say that the Act covers only Illinois residents or non-residents who have performed "sufficient" work in Illinois. [75] at 5–6. They say different drivers may be residents of different states and likely drove different amounts of time in Illinois, so figuring out who the Act applies to will require individualized analyses of each driver's logbooks, GPS information, and other documents—not proof common to all drivers. [75] at 5–7.

The Act does not have exterritorial reach. *Glass v. Kemper Corp.*, 133 F.3d 999, 1000 (7th Cir. 1998). But the proposed class is limited to drivers who worked "in Illinois." [72] at 2. Drivers spent thirty percent or more of their time in Illinois, and went to defendants' office for orientation and to pick up trucks and trailers. There is no risk here of extraterritorial application. Moreover, the "Wage Act's application is

not limited to any specific quantum of work performed in Illinois." *Watts v. ADDO Mgmt., L.L.C.*, 2018 IL App (1st) 170201, ¶ 21. Defendants argue that *Watts* is inconsistent with *Glass*, but I disagree. So long as some work was performed in Illinois and there is no risk of application to a nonresident employee who worked entirely outside of Illinois, the proposed class is consistent with both *Glass* and *Watts*. *Glass* does not require a "substantial portion" of work in Illinois, and that interpretation of the statute has since been jettisoned by the agency charged with the statute's administration. *See Watts*, 2018 IL App (1st) 170201, ¶¶ 17–20 (citing 56 Ill. Admin. Code 300.440, adopted at 38 Ill. Reg. 18517 (eff. Aug. 22, 2014)). The Act applies to employers and employees "in this State," and the proposed class comprises only drivers in Illinois. Individualized evaluation of class members' time in Illinois will not be necessary to resolve the questions common to the class.

### 2. *Employee or Independent Contractor*

The IWPCA provides "employees with a cause of action for the timely and complete payment of earned wages or final compensation." *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1050 (7th Cir. 2016) (quoting *Byung Moo Soh v. Target Mktg. Sys., Inc.*, 353 Ill.App.3d 126, 129 (1st Dist. 2004)). To that end, it imposes requirements related to the frequency of payment, the timing of payment, employees' entitlement to their own tips, deductions, and reimbursements, among other things. 820 ILCS 115/2–4.1, 9, 9.5.

Importantly, the Act only applies to employees. It does not apply to anyone, 820 ILCS 115/2:

(1) who has been and will continue to be free from control and direction over the performance of his work, both under his contract of service with his employer and in fact; and

(2) who performs work which is either outside the usual course of business or is performed outside all of the places of business of the employer…; and

(3) who is in an independently established trade, occupation, profession or business.

This test is conjunctive, which means an employer must satisfy all three elements to classify a worker as an independent contractor. *Costello*, 810 F.3d at 1050. Put differently, a worker who doesn't satisfy one element counts as an employee and is protected by the Act. The burden of proof lies with the employer to show that a worker is an independent contractor. *AFM Messenger Serv. v. Dep't of Emp. Sec.*, 198 Ill.2d 380, 397–98 (2001).

Plaintiff argues that all parts of the test can be adjudicated through common evidence. [72] at 9–12. First, plaintiff has alleged and provided supporting documents to show that all drivers were governed by the same agreement. *See* [72] at 5 (citing [72-3] at 25:23–26:1, 12:10-12 (the agreement is "the same for all the drivers")). Drivers were also subject to the same rules. [72] at 11. They all had to check in with dispatchers at a pre-set time, submit bills of lading and logbooks, use GPS devices that allowed IIK to track them, and complete deliveries within the time mandated by IIK management, among other things. [17] ¶¶ 35(b), 35(c), 35(e), 36; [72-3] at 56:11–57:6. All drivers worked exclusively for IIK and were barred from working for other companies. [72-3] at 15:13–16. This is common evidence that can determine whether drivers were free from control and direction.

12

Second, so long as the class members were doing the same work, common evidence will show whether that work was performed "outside the usual course of business or…outside all of the places of business of the employer." 820 ILCS 115/2. The class only includes delivery drivers; their usual course of business is the same, as is their usual place of business. Drivers may have driven different routes, but they all parked and picked up their trucks at specific locations and all delivered loads to specific customers' locations. (Whether those places are part of or outside IIK's place of business is a merits question.)

The third element is similarly conducive to resolution through common evidence. An independently established business is "capable of operation without hindrance from any other individual." *AFM Messenger Serv., Inc.*, 198 Ill.2d at 400. It must enjoy a "degree of economic independence such that the enterprise could survive any relationship with the particular person contracting for services." *Id.* at 401 (quoting *Jack Bradley, Inc. v. Dep't of Emp. Sec.*, 146 Ill.2d 61, 78 (1991)). Because the delivery drivers were subject to the same business model, whether or not they could survive independent of IIK can be adjudicated through common evidence. The employee/independent-contractor question is conducive to class-wide resolution.

### 3.    *Sections 9 and 9.5 of the Act*

Defendants say that, because the Act doesn't "provide a cause of action for damages based on the mere mischaracterization of an employee as an independent contractor," [75] at 7 (quoting *Enger v. Chi. Carriage Cab Co.*, 77 F. Supp. 3d 712, 715 n.3 (N.D. Ill. 2014)), individualized inquiries are required to decide whether

defendants violated the two sections at issue in plaintiff's complaint, Sections 9 and 9.5. [75] at 7.

Section 9 prohibits deductions by employers from wages or final compensation unless the deductions are "(1) required by law; (2) to the benefit of the employee…[or] (4) made with the express written consent of the employee, given freely at the time the deduction is made." 820 ILCS 115/9.

Defendants point to plaintiff's own testimony to show that the propriety of deductions will have to be determined deduction-by-deduction. [75] at 9 (noting plaintiff's testimony that some deductions are part of his suit and others are not). They say that not every driver had the same deductions, some had none, owner-operators had different types than lessees, IIK reimbursed some deductions, some deductions might be considered a benefit to the driver, and some deductions were authorized in writing. [75] at 10. "Because common proof cannot establish [that] all deductions from all drivers' pay violated Section 9, plaintiff cannot satisfy the commonality and predominance requirements," they say. [75] at 10.[5]

They make the same arguments about reimbursements under Section 9.5. That section requires employers to reimburse employees for "all necessary expenditures or losses incurred by the employee within the employee's scope of

---

[5] Defendants also say that the individualized-inquiry problem will be exacerbated by the fact that they can no longer identify their pre-2018 employees because of a fire that destroyed servers and paper records. *See* [75] at 3, 10, 15. Though defendants frame this as a commonality and superiority argument, it's really an ascertainability argument. Ascertainability, though, is about whether a class definition is so amorphous that it's hard to pinpoint who would qualify as a class member. It's not about whether clearly defined members are difficult to locate. Plaintiff will be required to propose an effective notice plan, but that issue does not defeat class certification for now.

employment and directly related to services performed for the employer." 820 ILCS 115/9.5(a). An employee must submit a reimbursement request with supporting documentation within 30 days of incurring the cost. *Id.* If the supporting documentation is nonexistent, missing, or lost, the employee must submit a signed statement about the receipts in order to be reimbursed. *Id.*[6]

Defendants say that without manually reviewing every expense submitted by every driver, they can't determine whether other drivers sought reimbursement, whether reimbursement was submitted within 30 days and was for "necessary expenditures," and whether those drivers were reimbursed. [75] at 11–12.[7]

Defendants miss the point here. The question for now isn't whether deductions were made or reimbursements not given, but instead whether common proof can determine if the drivers were classified in such a way that deductions were allowed and reimbursements required. If plaintiff is right, and the drivers were misclassified, then deductions were barred and reimbursements were required, with a few exceptions. If he's wrong, then the drivers have no claim under the Act. Plaintiff doesn't have to show that victory will turn on common proof. He only needs to show that some question will turn on common proof—here, whether the drivers were properly classified. As explained above, plaintiff has alleged and provided supporting

---

[6] Because Section 9.5 of the Act went into effect January 1, 2019, a class will only be able to make claims about defendants' failures to reimburse for work performed on or after that date.

[7] Defendants make another reimbursement argument. They say they have "no record that [plaintiff] ever requested reimbursement for any employment-related expenses," so his Section 9.5 claim fails. [75] at 11–12. That's a merits determination improper at this stage.

documents to show that all drivers were similarly situated on each of the three parts of the test. That's all that's necessary for purposes of class certification.

## C. Typicality

The named plaintiff's claim must "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and…[must be] based on the same legal theory." *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009) (citation and quotations omitted). "[T]he claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011). The typicality requirement addresses two concerns: "1) the representative's claim may fail on unique grounds, dooming meritorious claims of absent class members; or 2) the representative's claims may prevail on unique grounds, and the representative may therefore fail to adequately present alternative grounds under which the unnamed class members could prevail on their own claims." *Morr v. Plains All Am. Pipeline, L.P.*, 2021 WL 4554659, at *5 (S.D. Ill. Oct. 5, 2021) (citing *CE Design Ltd.*, 637 F.3d at 724).

Defendants say plaintiff's claims and defenses are unique because he isn't sure if he signed various contracts governing his employment and deductions. [75] at 12. He's also suggested that his signature on his employment contract might have been the result of "fraud" and his signatures on other documents might have been forged. [75] at 12 (citing [75-4] at 54:18–56:23, 62:10-23, 66:1-22, 75:8–76:2, 94:7-12).

Defendants say that if he didn't sign those agreements, he could potentially prevail on his claim that the deductions were improper. [75] at 12. In contrast, "drivers who signed those documents likely cannot claim deductions made under those agreements were improper." [75] at 12–13. That's wrong. Whether a person qualifies as an employee under the Act "has little to do with how any contract describes the work." *Johnson v. Diakon Logistics, Inc.*, 44 F.4th 1048, 1052 (7th Cir. 2022) (citing *O'Malley v. Udo*, 2022 IL App (1st) 200007, ¶ 48 ("[I]t is also well established that plaintiff's status under the [Act] is not controlled by how the parties referred to themselves in their agreement.")). The "critical test for determining whether plaintiffs count as employees for purposes of the Act comes from the statute rather than a contract"— "the Service Agreement is irrelevant, no matter what it says." *See id.* Whether an employer can deduct money from an employee's pay, therefore, is also determined by the statute and not any contract. *See Byrne v. Hayes Beer Distrib. Co.*, 2018 IL App (1st) 172612, ¶ 32 (2018). Any difference between plaintiff and the other class members on this front is beside the point; their worker classification was all governed by the same statute, not by contract.

Defendants say plaintiff's claims fail on other unique grounds, including: not providing two weeks' notice before leaving IIK, consenting to multiple deductions of the sort that other drivers might not have consented to, and failing to timely submit receipts for necessary expenditures. [75] at 13. Defendants also say that plaintiff's deductions claims cannot be typical of the deduction claims of owner-operators. [75] at 13. But again, the threshold merits question is whether plaintiffs were improperly

classified as independent contractors. Class certification asks whether there is common proof that would answer that question. Evidence about deductions and reimbursements is immaterial to the independent-contractor question, so differences in proof on those issues are beside the point and do not make plaintiff's claim atypical.

### D. Adequacy

Representative parties must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy inquiry is composed of two parts: adequacy of the named plaintiff's counsel and adequacy of the named plaintiff in protecting the interest of the class members. *Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993) (citing *Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 697 (7th Cir. 1986) (en banc)). Defendants don't contest class counsel's ability to represent the class. Still, I have an independent duty under Rule 23(c) to ensure that Rule 23(a)'s requirements are met in order to "protect[] absent class members whose rights may be affected by the class certification." *Davis v. Hutchins*, 321 F.3d 641, 649 (7th Cir. 2003).

To determine whether class counsel is adequate, I must consider the work they've done in identifying or investigating potential claims in the case; their experience in handling class actions, other complex litigation, and the types of claims asserted in the case; their knowledge of the applicable law; and the resources they'll commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A). I may also consider anything else that's relevant to their ability to fairly and adequately represent the class. Fed. R. Civ. P. 23(g)(1)(B). I have no concerns about the four required criteria under Rule 23(g)(1)(A), but I have concerns about how informed Ms. Bikbova has kept

her client about this case. Asked in a deposition about what would happen if the case settled, Prokhorov said, "I don't recall...I doubt that there will be any settlement." [75-4] at 181:2-8. Asked whether he was aware that there was an amended complaint filed in the case, Prokhorov responded, "I'm clueless." [75-4] at 188:14-18. Most concerning were his answers to questions about legal fees, [75-4] at 208:19-23; 212:23–213:11, 16-18; 214:7-13.

> Q: [I]f you recover any attorneys' fees as part of this case, will you get a portion of those?...
>
> A: I hope so. This is the first time I'm part of a case like that.
>
> Q: If you win, will your attorneys get paid?
>
> A: No, she's working for free.
>
> Q: If you lose, will---...the attorney get paid?
>
> A: Volunteer.
>
> Q: And, if you lose, do you know whether your attorneys will get paid or not?
>
> A: I don't have a clue, but I won't lose.
>
> Q: If there's an order requiring you to pay defendants' attorneys' fees or costs, would you be able to afford those?
>
> A: I'm ready—I'm ready for the fact that I won't be paying anybody. They'll be paying me.

Class counsel is responsible for keeping their clients in the know. A client doesn't need to know the ins and outs of the lawsuit, *see Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363 (1966), but he should at least be informed about how the outcome of the suit will impact him financially and how class counsel is making their money. It could be that Prokhorov was informed about all this and simply forgot, in which

19

case class counsel isn't to blame. Based on this record alone, I am not convinced that class counsel would be unable to represent the class. But class counsel must be prepared to address my concerns when proposing a notice plan and provide assurances that counsel will give competent and accurate advice to the class.

The class representative cannot have "antagonistic or conflicting" interests to the class as a whole and cannot present severe credibility problems. *See Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) (antagonistic or conflicting interests); *CE Design Ltd.*, 637 F.3d at 726 (credibility problems). The conflicting-interests factor often merges with typicality. *See CE Design Ltd.*, 637 F.3d at 726; *Robinson v. Sheriff of Cook Cty.*, 167 F.3d 1155, 1157 (1999) ("[I]f [plaintiff's] claim is atypical, he is not likely to be an adequate representative."). Defendants' conflicting-interest arguments are the same as their typicality arguments (that Prokhorov may win or lose for reasons unique to him), [75] at 13–14, and therefore unpersuasive for the same reasons, too.

Defendants next say that Prokhorov isn't an adequate representative because he isn't credible. [75] at 14–15. They point to two incidents. One involves a text-message exchange between Prokhorov and Kazniyenko. [75] at 14 (citing [75-2] ¶¶ 29–30; [75-2] at 33 (screenshot of messages); [75-4] at 144:22–145:17, 146:3–5). The exchange is in Russian. According to a declaration from Kazniyenko, who is a native Russian speaker (as is Prokhorov), the exchange went as follows, [75-2] ¶¶ 29–30:

Prokhorov: 2 min. How long is that

Kazniyenko: Ha ha

Kazniyenko: Only one minute past

Kazniyenko: I am sick, can I call you tomorrow

Kazniyenko: Good?

Prokhorov: Get drunk, kill

Kazniyenko: Who

Kazniyenko: Dimy?

Prokhorov: You

Defendants say this exchange shows Prokhorov threatening to kill Kazniyenko. [75] at 14. That may very well be true, but too much has been lost in translation to reach that conclusion. Even if Prokhorov did threaten Kazniyenko, and the threat showed Prokhorov was sufficiently biased against Kazniyenko to raise questions about the veracity of Prokhorov's allegations, that credibility issue wouldn't matter at this stage. Prokhorov's credibility will factor in at the stage when he claims specific deductions and reimbursements; it isn't relevant to the questions that are common to the class.

The second incident defendants point to involves an alleged accident. According to defendants, while backing into a loading bay at a warehouse, Prokhorov hit another truck and then drove away from the scene. [75-2] ¶ 26; [75] at 9. IIK later received video footage of the incident, and according to defendants, showed the video to Prokhorov at IIK's offices. [75-2] ¶ 28; [75] at 14–15. After Prokhorov saw the video, he acknowledged that the accident was his fault and agreed that an insurance

deductible could be deducted from his pay, defendants say. [75-2] ¶ 28; *see* [75] at 14–15. Prokhorov denies that he hit the truck and denies that he ever saw the video. [75-4] at 126:6-9. Defendants say this calls his truthfulness into question because it conflicts with IIK's testimony (presumably they mean Kazniyenko's testimony). [75] at 14–15. As before, any issues about Prokhorov's credibility are not relevant to whether he can represent a class on the merits of an employee-misclassification claim. Prokhorov and class counsel are adequate representatives of the class.

### E.   Predominance

For a class to be certified under Rule 23(b)(3), the questions of law or fact common to the class must predominate over any questions affecting only individual members. Fed. R. Civ. P. 23(b)(3). "[A] common question predominates over individual claims if 'a failure of proof on the [common question] would end the case' and the whole class 'will prevail or fail in unison.'" *Bell*, 800 F.3d at 378 (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013)). In *Bell*, a common question—whether PNC Bank had an unofficial policy of denying overtime wages—predominated because, depending on the answer, all the class members' claims could fail in unison. *Id.* at 378. Other facts, such as how many hours of off-the-clock work each employee worked or the intent of the manager, made no difference to the class as a whole. *Id.* at 379. The same was true in *Chicago Teachers Union, Local No. 1 v. Bd. of Educ.*, where "the key question upon which all of the litigation [rose] or [fell] [could] be answered for every plaintiff: was the selection process discriminatory?" 797 F.3d at 444. Here, the answer to a single question will have the same domino effect. If the drivers were employees, the Act will apply to them, and

certain deductions and failures to reimburse were illegal. If the drivers were independent contractors, they will not be able to seek relief under the Act. The class fulfills Rule 23(b)(3)'s predominance requirement.

### F. Superiority

Under Rule 23(b)(3), a class should only be certified if "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Class actions are generally superior in two contexts: where "small recoveries [would] not provide the incentive for any individual to bring a solo action prosecuting his or her rights," *see Mullins*, 795 F.3d at 658, and where collective treatment "would achieve economies of time, effort, and expense, and promote…uniformity of decision as to persons similarly situated," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (quoting Fed. R. Civ. P. 23(b)(3) advisory committee's note to 1966 amendment). The question is not whether the class action would be difficult to manage—class actions often are—but instead whether the class mechanism would be inferior to hundreds of individual suits, or (where recoveries are small) no suits at all. "Ironically, those Rule 23(b)(3) actions requiring the most management may yield the greatest pay-off in terms of effective dispute resolution." *Mullins*, 795 F.3d at 664 (quoting 7AA Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1780 (3d ed.)); *see also id.* ("[I]f courts look only at the cost side of the equation and fail to consider administrative solutions like those available under Rule 23(c) and (d), courts will err systematically against certification.").

It's hard to determine ex ante how much incentive the drivers have to sue. They worked for IIK for different lengths of time (though often less than two years,

*see* [72-6]), recorded different mileage, presumably had different amounts deducted from their pay, and presumably are owed different amounts in reimbursement (assuming they prevail on the merits). If their claims are too low to be worth pursuing individually, that's a reason to find a class action superior. *See Carnegie v. Household Int'l Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30. But a class action has to be unwieldy indeed before it can be pronounced an inferior alternative…to no litigation at all."). Even if their claims are large enough to be worth pursuing individually, the commonality of the claims is a reason to find a class action superior. Different judges won't have to decide the same classification issue—based on identical material facts—again and again, expending unnecessary time and effort and creating the risk of different outcomes. Resolving this case as a class action is superior to resolving it via alternative methods.

## IV.   Conclusion

The motion to certify the class, [71], is granted, and the class is certified as follows: All individuals who worked in Illinois as delivery drivers for IIK between November 17, 2010, and the present and who were classified as independent contractors.

ENTER:

_____
Manish S. Shah
United States District Judge

Date:  March 30, 2023

24