**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ANDREY PROKHOROV, individually and on behalf of all others similarly situated,<br><br>             Plaintiff,<br><br>       v.<br><br>IIK TRANSPORT, INC., 11K TRANSPORT, INC., IVAN KAZNIYENKO, and SERGII STETSIUK,<br><br>             Defendants. | No. 20 CV 6807<br><br>Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Andrey Prokhorov worked as a delivery driver for defendant IIK Transport. He alleges that IIK took deductions from drivers' pay and failed to reimburse drivers' work expenses in violation of the Illinois Wage and Payment Collection Act. He says IIK did this by misclassifying drivers as independent contractors, who are not protected by the Act. Prokhorov represents a class of truck drivers who were classified as independent contractors by IIK. Defendants IIK and its owner, Ivan Kaznyienko, move for summary judgment on the issue of the Act's application to class members and on the merits of the claims. IIK and Kazniyenko move to decertify the class in the alternative. Prokhorov moves for partial summary judgment only as to the application of the Act and the classification of drivers as employees. While driving for IIK Transport, Prokhorov alleges that he also delivered some shipments for defendant 11K Transport. He brings an individual claim against

11K Transport and its owner, Sergii Stetsiuk, for the same violations of the Act. Defendants 11K and Stetsiuk move for summary judgment. For the reasons discussed below, 11K's and Stetsiuk's motion for summary judgment is granted. Plaintiff's partial motion for summary judgment is granted. IIK's and Kazniyenko's motion is denied in part and granted in part.

## I. Legal Standard

A motion for summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). These standards apply equally to cross-motions for summary judgment, *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017), and I consider evidence from both motions to ensure that there is no material dispute, *Torry v. City of Chicago*, 932 F.3d 579, 584 (7th Cir. 2019).

## II. Facts

Plaintiff Andrey Prokhorov worked as a delivery driver for defendant IIK Transport from August 2018 to June 2020. [148] ¶ 5; [152] ¶ 13.[1] IIK Transport is a

---

[1] Bracketed numbers refer to entries on the district court docket and page numbers refer to the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page numbers. Facts are taken from the parties' responses to Local Rule 56.1 statements of facts and additional facts, [148], [152], [154-1], [157], [159], and [161], where both the asserted fact and response are sent forth in one document. An asserted fact that is not controverted by reference to specific, admissible evidence is deemed admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559

trucking company owned by defendant Ivan Kazniyenko that provides long-haul freight delivery services. [148] ¶¶ 1–2 [152] ¶ 1. Prokhorov was interviewed and hired by Kazniyenko. [152] ¶ 14. He signed an independent driver agreement with IIK through his corporation, American Cars, LLC. [148] ¶ 5. IIK classified delivery drivers like Prokhorov as independent contractors, and all drivers were required to sign the same independent driver agreement with IIK on behalf of their corporate entities. [148] ¶ 3; [152] ¶¶ 45–47, 56. Drivers were paid either on a per-mile basis or based on the weight of the freight they delivered.[2] [152] ¶ 57.

When they first started the job, every driver had to go to IIK's offices in Illinois to drop off paperwork, undergo a background check and drug test, complete a road test, attend orientation, and pick up their truck from the yard. [152] ¶ 61; [161] ¶¶ 2–3, 18. Drivers had to drive a company truck with an "IIK Transportation" logo and IIK's DOT number on it. [152] ¶ 48. All trucks contained a GPS device used to track drivers; these devices automatically generated speed violation alerts sent directly to

---

F.3d 625, 632 (7th Cir. 2009). I disregard legal arguments in the statement of facts. *See Cady v. Sheahan*, 467 F.3d 1057, 1060–61 (7th Cir. 2006); *see* [148] ¶¶ 21, 24, 25, 27, 30, 31, 33–35; [154-1] ¶¶ 4, 8. The parties dispute many facts, but the facts in those disputes are not material. To the extent disputed facts are relevant and the parties rely on admissible evidence, I include them in the light most favorable to the nonmovant.

[2] The parties dispute the extent to which IIK determined drivers' pay. [152] ¶¶ 58–60. Prokhorov asserts that drivers could not negotiate their per-mileage rate. IIK asserts that drivers could negotiate the rate. Both cite to Kazniyenko's deposition in support of their assertions. Kazniyenko testified that the pay rate depended on the specific driver's qualifications, there was room for negotiation, and he made the final decision for IIK. *See* [140] at 39 (14:2–10) ("Q. How is the pay rate decided? A. It depends on the experience and the record of the driver… And, of course, the drivers negotiate the price. Q. Are you the one who decides on behalf of IIK what the rate will be? A. Yes, always me."). Prokhorov stated in his declaration that he was not able to negotiate his rate. *See* [138-1] ¶ 16. Both parties rely on admissible evidence, but resolving this factual dispute is not determinative of the question of drivers' classification under the Act.

IIK if drivers exceeded the speed limit. [152] ¶ 66. Drivers received delivery assignments from IIK's dispatchers and were required to regularly check in with the dispatchers to follow their instructions about which loads to haul and where and when to pick up those loads.[3] [152] ¶ 18. Drivers were also instructed on which routes to take, though they had flexibility to choose routes to cut down on miles or avoid traffic. [152] ¶ 18. IIK employees regularly emailed drivers with instructions about submitting paperwork, following safety rules, and other requirements. [152] ¶ 65. Drivers were required to notify IIK in advance if they wanted to take time off.[4] [152] ¶ 70. They were also required to submit weekly packets showing the deliveries they made. [152] ¶ 71. IIK would generate weekly statements listing payments and deductions to drivers. [152] ¶ 72.

IIK Transport took deductions from drivers' pay.[5] [152] ¶ 72 Some of these deductions were mentioned in the independent driver agreement. Deductions

---

[3] IIK disputes that it required drivers to follow a dispatcher's instructions as to where and when to pick up loads; it says that those instructions were dictated by brokers and customers. [152] ¶ 18. That IIK's instructions to drivers were driven by brokers' and customers' demands does not controvert Prokhorov's assertion that IIK then made those assignments to drivers. IIK also disputes Prokhorov's assertion that drivers were not permitted to turn down assignments. It asserts that drivers could decline hauling a load due to personal reasons and that dispatchers provided options to drivers to choose from. [152] ¶ 64. Here too, both parties rely on admissible evidence. As discussed above, the resolution of this factual dispute is not determinative.

[4] IIK disputes this, but its record citation to Kazniyenko's declaration does not properly controvert this fact with specific evidence. Kazniyenko's declaration broadly states that "[d]river set their own hours of work and working schedule." [152-1] ¶ 18. That assertion does not dispute the requirement of advance notice.

[5] Prokhorov does not dispute that these deductions are mentioned in the independent driver agreements, but he disputes that drivers consented to them at the time of the deduction in compliance with the Act. *See* [148] ¶¶ 17–19, 21–26, 34–35. These are not disputes of fact, but disputes of law that I address below.

mentioned in the agreement included charges for: log book deficiencies,[6] paperwork deficiencies,[7] vehicle damage,[8] failure to maintain vehicle, insurance deductibles,[9] and other fines and penalties. [148] ¶¶ 13–16, 19–26. IIK took the following deductions from Prokhorov's paycheck: charges for damage to his vehicle caused by frozen brake pads, reimbursement for a late fee charged by a customer to IIK based on Prokhorov's late delivery, and insurance deductibles following an accident in Indiana. [148] ¶¶ 20, 24, 26. Drivers were also charged escrow deposits of $1,000 to cover costs charged to IIK such as speeding tickets. [148] ¶ 17. The independent driver agreement stated that the escrow deposit would be returned (minus the costs charged) so long as drivers provided two weeks' notice. [148] ¶ 17. Some drivers never received the escrow back from IIK, which IIK says were for valid reasons under the agreement.[10] [148] ¶ 17.

---

[6] The agreement imposed the following charges for drivers violating federal, state, or local laws on log books: $500 for the first violation; $1,000 for the second violation; and $500 for moving or equipment violations. [148] ¶ 13.

[7] Drivers were subject to a $300 weekly charge if they did not timely submit records about their loads. [148] ¶ 15.

[8] These costs involved vehicle damages outside of normal wear-and tear, costs from a vehicle being mired, damage from a vehicle being driven on unpaved road, and costs of cleaning spills or any other issues from an accident. [148] ¶ 19.

[9] The agreement required a $2,500 insurance deductible for physical damage to a tractor or trailer; a $2,500 insurance deductible for driver liability; and a $2,500 insurance deductible for damage to cargo in an accident caused by a driver's error or negligence. [148] ¶ 25.

[10] The escrow provision states: "The amount of principal to be held 'escrow funds' shall be amount equal to $1,000.00 owed to Contractor by Company. In even that Contractor did not submit weekly trip envelope including vital documentation such as: Bill of Lading, Unloading receipts, and log books, an additional week could be held in escrow funds until the mentioned documentation is submitted to I.I.K. Transport, Inc." [140] at 156. Sometimes, this amount would be paid upfront by a driver, and sometimes it would be deducted from a driver's pay. [140] at 14 (¶ 9). There is a dispute about the circumstances of Prokhorov's separation from

Two deductions were applied pursuant to separate agreements signed by drivers for third-party services: the Drivers Legal Plan and occupational accident insurance. [148] ¶¶ 27–35. The Drivers Legal Plan provided drivers with access to lawyers who would help them resolve tickets and other traffic issues at a set cost of $2.98 per week.[11] [148] ¶ 29. IIK also took deductions for $100 deductibles when a driver used the plan's services. [148] ¶ 30. IIK deducted these amounts from Prokhorov's paycheck three times: $100 in June 2019 for a ticket in Oklahoma, $100 in March 2019 for a ticket in Maryland, and $105.50 in June 2019 for a ticket in Maryland. [148] ¶ 31. The occupational accident insurance provided additional insurance through Zurich American Insurance Company at a cost of $40 per week. [148] ¶¶ 32–33. In addition to the weekly charge, drivers were charged for tickets or repairs under the insurance plan. [148] ¶ 35. IIK deducted $26.06 from Prokhorov's pay for a parking ticket in February 2019. [148] ¶ 36.

Two deductions were made without reference to any written agreement: drug testing and electronic log device services.[12] [148] ¶¶ 38–41, 46–47. IIK was charged for costs of drivers' drug tests and deducted those costs from drivers' pay. [148] ¶ 46. The electronic log device monitoring service was operated by a third party at the cost

---

IIK, *see* [148] ¶ 18, but that dispute isn't material to the use of an escrow deposit charge or the propriety of deductions from wages of amounts chargeable to escrow.

[11] Prokhorov disputes that this plan was "offered" because he did not have an option to choose. [148] ¶ 27. Whether Prokhorov freely chose to sign this contract is a legal issue, not a factual dispute.

[12] IIK also offered cash advances for drivers' personal expenses, which drivers reimbursed IIK through deductions to weekly pay statements. [148] ¶ 42. Prokhorov does not challenge the cash advance deduction. [148] ¶ 45.

6

of $10 per week to drivers. [148] ¶ 39. Federal law requires long-distance drivers to maintain log books, and the service provided technical assistance to drivers. [148] ¶¶ 38–40.

Drivers also paid out-of-pocket for expenses incurred as a part of the job.[13] [152] ¶¶ 24, 44; [161] ¶ 23. These included costs of cell phone payments, repair tools, and GPS. [152] ¶ 24.

While driving for IIK Transport, Prokhorov also delivered loads for 11K Transport. [159] ¶ 15. When he delivered loads for 11K, he was told to "check in" under 11K's name and received bills of lading for 11K.[14] [159] ¶ 15. 11K never made any payments to Prokhorov or his corporate entities for these deliveries.[15] [154-1]

---

[13] IIK asserts that it reimbursed Prokhorov and other drivers including Anatoliy Radchuk and Anthony John George for costs associated with scales, fuel, repairs, and parking. [161] ¶ 23. It also asserts that Prokhorov and George never submitted receipts for cell phone bills and repair tools for reimbursement. [161] ¶ 23. Prokhorov and George stated that they incurred these out-of-pocket costs but didn't state that they submitted requests for reimbursements. *See* [138-1] ¶ 21 (Prokhorov declaration); [138-3] ¶ 21 (George declaration). The assertion that these drivers didn't ask for reimbursement is not disputed.

[14] IIK disputes that the record shows Prokhorov received bills of lading. [159] ¶ 15. But Prokhorov testified that he received bills of lading for 11K. *See* [134] at 297–98 (169:19–170:8).

[15] Prokhorov disputes that 11K did not make any payments to him. [154-1] ¶ 6. He says that he received pay statements from IIK reflecting deliveries and deductions from deliveries that he performed for 11K. But this does not controvert 11K's assertion that it did not make any payments to him. Prokhorov admits that all payments and deductions were through IIK. *See* [134] at 297–98 (169:19–170:8) ("Q. And did you ever have any sort of oral agreement with 11K to be a driver for 11K? A. What do you mean? I was told to check in under 11K. So when I would arrive, I would register either under 11K or IIK. On the truck it looked the same. And don't you understand that it was just a trick for the company? Q. When you say you were told to check in under 11K, what do you mean? A. What I mean is that I performed jobs for 11K, but IIK was the one that reimbursed."); *id.* at 299 (171:7–13) ("Q. Okay. I just want to make sure. You never -- did you ever have an oral agreement with 11K that 11K would pay you any compensation? A. I didn't have an agreement. Q. And 11K never paid you anything. Is that correct? A. Never did they ever pay.").

¶¶ 5–6. Sergii Stetsiuk previously worked as a manager at IIK from 2012 to 2014 before founding 11K Transport in 2014. [154-1] ¶ 2; [159] ¶ 1. As a manager at IIK, Stetsiuk was involved with hiring and terminating drivers, making decisions related to compensation, and assigning deliveries to drivers. [159] ¶¶ 4–5. Stetsiuk and Kazniyenko maintained a personal relationship and continued to communicate frequently even after Stetsiuk left IIK. [154-1] ¶ 17; [159] ¶ 12. Stetsiuk also kept a desk at IIK's office, where—in addition to his home office—he worked to run 11K's operations.[16] [159] ¶ 13. 11K has its own DOT number and contracts with IIK. [154-1] ¶ 16; [159] ¶ 7. Around 20% to 30% of 11K's deliveries were for IIK. [159] ¶ 7. 11K used the same form template for its independent driver agreements as IIK used but entered into separate agreements with its drivers. [159] ¶ 10. 11K operates on a smaller scale than IIK—it contracts with about twelve drivers at any given time. [154-1] ¶ 3.

I granted Prokhorov's motion for class certification, [71], and certified the class as: All individuals who worked in Illinois as delivery drivers for IIK between November 17, 2010, and the present and who were classified as independent contractors. [81]. Prokhorov brings claims on behalf of the class against defendants IIK Transport and Ivan Kaznyienko for violations of the Illinois Wage and Payment Collection Act, alleging that defendants made illegal deductions from class members'

---

[16] Prokhorov asserts that the two companies share a yard and that the trucks bear both IIK and 11K logos. [159] ¶ 11. The record citation to Kazniyenko's deposition does not support the fact. *See* [140] at 43 (18:14–18). And Stetsiuk testified only that he has a desk at IIK's office, which he works out of along with his home office. *See* [134] at 13 (7:8–8:5).

pay and unlawfully required them to incur expenses that should have been reimbursed.[17] *See* [17] ¶¶ 1–2, 45–53. He brings the same claims under the Act on an individual basis against defendants 11K Transport and Sergii Stetsiuk.[18] *See* [149] at 1 n.1.

## III. Analysis

The Illinois Wage and Payment Collection Act governs the payment and collection of employee wages. *See* 820 ILCS 115/1 *et seq.*[19] The Act allows employees to enforce the terms of their compensation contract or agreement with their employer. *Chagoya v. City of Chicago*, 992 F.3d 607, 624 (7th Cir. 2021) (citing 820 ILCS 115/2, which defines the term "wages," and noting that the Act does not provide wage-related relief beyond what the underlying contract requires). An employment agreement is "broader than a contract and requires only a manifestation of mutual assent on the part of two or more persons." *Landers-Scelfo v. Corp. Off. Sys., Inc.*, 356 Ill.App.3d 1060, 1067 (2d Dist. 2005). An agreement need not be explicit—it may be formed through acquiescence, custom, or practice. *Chagoya,* 992 F.3d at 625. "[A]n employer and an employee, by acting in a manner consistent with an employment

---

[17] The court previously found jurisdiction to be satisfied over these state-law claims under the Class Action Fairness Act. *See* [25] at 2 n.2; 28 U.S.C. § 1332(d)(2); *Roppo v. Travelers Commercial Ins. Co.*, 869 F.3d 568, 578 (7th Cir. 2017). Jurisdiction under the Class Action Fairness Act attaches at the time a case is filed. *In re Burlington N. Santa Fe Ry. Co.*, 606 F.3d 379, 381 (7th Cir. 2010).

[18] The parties don't dispute that Sergii Stetsiuk's and Ivan Kazniyenko's individual liability runs with 11K Transport's and IIK Transport's liability respectively. I refer only to the companies throughout the opinion for sake of simplicity.

[19] A federal court sitting in diversity applies state substantive law. *Horne v. Electric Eel Manufacturing Company, Inc.*, 987 F.3d 704, 713 (7th Cir. 2021). The parties do not dispute that Illinois law applies.

agreement, can set the material terms of the agreement, including the amount of compensation and the identity of the employer." *Landers-Scelfo,* 356 Ill.App.3d at 1068.

In addition to protecting agreed-upon wages, the Act also prohibits employers from taking improper deductions from an employee's paycheck—unless the deductions are 1) required by law; 2) to the benefit of the employee; 3) in response to a valid wage assignment or wage deduction order; or 4) made with the express written consent of the employee, freely given. 820 ILCS 115/9 (listing additional exceptions for employers that are governmental entities). Employers must also reimburse employees for all necessary expenditures incurred by an employee. 820 ILCS 115/9.5.

Importantly, the Act only applies to employees. It does not apply to anyone, 820 ILCS 115/2:

> (1) who has been and will continue to be free from control and direction over the performance of his work, both under his contract of service with his employer and in fact; and

> (2) who performs work which is either outside the usual course of business or is performed outside all of the places of business of the employer…; and

> (3) who is in an independently established trade, occupation, profession or business.

This test is conjunctive, which means an employer must satisfy all three elements to classify a worker as an independent contractor. *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1050 (7th Cir. 2016). Put differently, a worker who doesn't satisfy one element counts as an employee and is protected by the Act. The burden of proof lies

with the employer to show that a worker is an independent contractor. *AFM Messenger Serv. v. Dep't of Emp. Sec.*, 198 Ill.2d 380, 397–98 (2001).

### A.     11K Transport's and Stetsiuk's Liability

Prokhorov admits that there was no written employment agreement between himself and 11K Transport. [149] at 6. Prokhorov (through his corporate entity American Cars LLC) only signed an independent driver agreement with IIK Transport. [152] ¶¶ 13–15. Instead, he argues that there was an implicit employment agreement between himself and 11K and that 11K is liable under the Act as his joint employer. Prokhorov points to the close relationship between defendants IIK and 11K as evidence of an employment agreement between himself and 11K. [149] at 4–7. Stetsiuk worked as a manager at IIK before founding 11K. [154-1] ¶ 2; [159] ¶ 1. He maintained a desk at IIK and a close personal relationship with IIK's owner Kazniyenko even after starting his own trucking company. [154-1] ¶ 17. Between 20% to 30% of 11K's deliveries were for IIK. [159] ¶ 7. When making deliveries for 11K, Prokhorov checked in under 11K and received bills of lading for 11K. [159] ¶ 15.

While these facts suggest some type of arrangement between IIK and 11K, it does not raise a genuine issue of material fact as to an implicit employment agreement existing between 11K and Prokhorov. An employer's acquiescence or the existence of custom or practice are ways in which an implicit agreement may be formed, *see Chagoya*, 992 F.3d at 625, but nothing in the record suggests 11K acquiesced to compensating Prokhorov for the deliveries. For example, an employer may acquiesce to an employee working overtime hours not agreed upon under written contract if it pays the employee for those overtime hours anyways. *See id.* Here,

Prokhorov admits that he performed jobs for 11K but was never paid by 11K. Rather, IIK always paid him and made deductions for any deliveries made for 11K. *See* [134] at 298 (170:7–8). Payments and deductions made through IIK may be evidence of some agreement between 11K and IIK, but it does not suggest an independent employment agreement for 11K to pay Prokhorov. *See, e.g., Bruger v. Olero, Inc.*, No. 19-CV-2277, 2023 WL 6290090, at *7 (N.D. Ill. Sept. 27, 2023) (finding no implicit employment agreement where plaintiff delivered some loads for another trucking company but was paid only by the company he signed an independent contractor agreement with). Prokhorov cites to *Johnson v. Logistics*, No. 16-CV-06776, 2018 WL 1519157, at *9 (N.D. Ill. Mar. 28, 2018), where the court found it reasonable to infer that an agreement existed between plaintiff-driver and the defendant-company where plaintiff signed an independent contract agreement through his corporate entity. But 11K is not arguing that no agreement exists because Prokhorov signed an agreement through his corporation. The issue is that there was no evidence of an implicit agreement between 11K and Prokhorov, either on behalf of himself or his corporate identity. Without any evidence of an independent agreement between Prokhorov and 11K, Prokhorov does not raise a genuine dispute of fact as to whether there was mutual assent to enter into an employment agreement.

Prokhorov claims that IIK and 11K acted as his joint employers. Two or more employers may be held jointly liable under the Act if they "exert significant control over the same employees—where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of

12

employment." *Andrews v. Kowa Printing Corp.*, 217 Ill.2d 101, 117 (2005) (internal quotation marks omitted). Relevant factors include the joint employer's role in "hiring and firing; promotions and demotions; setting wages, work hours, and other terms and conditions of employment; discipline; and actual day-to-day supervision and direction of employees on the job." *Id.* Prokhorov points to Stetsiuk's managerial role at IIK from 2012 to 2014 to suggest that 11K exerted significant control over IIK's employees. [149] at 7–8. But once Stetsiuk left IIK, he no longer exerted control over hiring and firing, day-to-day supervision, or setting the terms of IIK drivers' employment. [159] ¶¶ 2–5. Prokhorov's suit is based on his time working for IIK from 2018 to 2020—several years after Stetsiuk left his role at IIK.[20] [154-1] ¶ 2; [159] ¶ 14. Mere overlap between drivers and office space without some evidence of 11K's control over the essential terms and conditions of Prokhorov's employment is insufficient to establish joint employer liability. *See Andrews*, 217 Ill.2d at 117–18 (rejecting plaintiffs' evidence that some employees worked for both companies where different agreements set the terms of employment for employees at each company). Prokhorov cites to *Tsybikov v. Dovgal*, No. 19-CV-3334, 2023 WL 4029823, at *2 (N.D. Ill. June 15, 2023), a case similarly involving truck drivers classified as independent contractors, where the court granted plaintiff's motion for summary judgment against

---

[20] Prokhorov testified that his time at IIK from 2013 to 2014 is not a basis for this lawsuit. *See* [134] at (27:22–28:2) ("Q. Okay. So are you alleging in your lawsuit that any deductions that IIK took -- may have taken from your pay in 2013 or 2014 are part of your lawsuit? A. No. I don't have any documents that I can review and calculate everything. I don't remember."). In Prokhorov's statement of facts in support of his motion for summary judgment against IIK, [152], he asserts only that he worked for IIK as a delivery driver between August 31, 2018 and June 2020. *See* ¶ 13.

two different employers. But the existence of an employment agreement or joint employer liability was not discussed in *Tsybikov*.

No reasonable jury could find an implicit employment agreement between 11K and Prokhorov or that 11K exerted sufficient control over Prokhorov to be liable as a joint employer with IIK. Because there was no violation of the Act by 11K Transport, Stetsiuk is not individually liable as 11K's owner. Defendants 11K Transport's and Stetsiuk's motion for summary judgment is granted.

### B.   IIK Transport's and Kazniyenko's Liability

#### 1.   *Extraterritoriality*

Defendants IIK and Kazniyenko and plaintiff both move for summary judgment on the Act's application to class members. *See* [137] at 13. Defendants argue that Prokhorov and other class members did not perform enough work in Illinois to claim protection under the Act. [141] at 9–12.

The Act "applies to all employers and employees in this State," 820 ILCS 115/1. It does not have exterritorial reach. *Glass v. Kemper Corp.*, 133 F.3d 999, 1000 (7th Cir. 1998); *see also Adams v. Catrambone,* 359 F.3d 858, 865 (7th Cir. 2004) (holding that the Act applies to nonresidents who perform work in Illinois for an Illinois employer). The Act's "application is not limited to any specific quantum of work performed in Illinois." *Watts v. ADDO Mgmt., L.L.C.*, 2018 IL App (1st) 170201, ¶ 21. Defendants raise the same arguments about the applicability of *Watts* that I addressed at the class-certification stage. *See Prokhorov v. IIK Transp., Inc.*, No. 20-CV-6807, 2023 WL 2711599, at *4 (N.D. Ill. Mar. 30, 2023). I reiterate that *Watts* is not inconsistent with *Glass*. While *Glass* set the outer boundary for the Act's reach—

14

a non-resident who performed *no* work in Illinois and exclusively worked in Spain did not qualify for the Act's protection—it did not otherwise establish a minimum threshold for coverage.[21] *See Glass*, 133 F.3d at 1000–01. I previously noted that the court in *Watts* relied on the Illinois Department of Labor's 2014 amendments to the regulations implementing the Act, which eliminated any reference to a minimum amount of work required for the Act to apply. *See Watts*, 2018 IL App (1st) 170201, ¶ 20. IIK cites to *Cline v. FitzMark Chicago, Inc.,* No. 21-CV-04253, 2023 WL 2711615, at *6 (N.D. Ill. Mar. 30, 2023), in which the court found that the agency's amended regulation was related to the agency's jurisdiction over wage claims rather than the standing of an employee to bring a federal lawsuit under the Act. But the regulation's connection to agency jurisdiction does not mean it is irrelevant to understanding the scope of the Act. Subsection (a) of the amended provision titled "Jurisdiction" interprets the statutory phrase "in this State." Ill. Admin. Code tit. 56, § 300.440(a) (2014). In this case, the agency's assertion of jurisdiction over a claim also relates to what types of claims that the agency recognizes as cognizable under the Act. *Cf. Andrews v. Kowa Printing Corp.*, 217 Ill.2d at 116 (2005) (referring to the Illinois Department of Labor's regulations implementing the Act as "an informed source for guidance when seeking to ascertain the legislature's intention when the statute was enacted").

---

[21] IIK cites to *Kalechstein v. Abbassian*, No. 15-cv-5929, 2017 WL 3394721 (N.D. Ill. Aug. 8, 2017), to support its argument for a minimum work requirement. The court found that the Act did not apply because plaintiff only spent 2% of his work weeks in Illinois. *Id.* at *6. I am not persuaded by *Kalechstein*, which was decided before the Illinois Appellate Court's decision in *Watts*.

The parties spill a lot of ink on how to measure the amount of work performed by class members in Illinois. IIK says that only 8 out of 97 class members possessed commercial driver's licenses issued by Illinois. [148] ¶ 7. And according to an analysis of the mileage driven by seven randomly selected class members, these drivers only drove anywhere from 4.53% to 8.02% of miles in Illinois. [148] ¶ 9. Prokhorov objects to IIK's analysis on several fronts. Defendants did not produce the underlying data on which their analysis is based. And even if the data were admissible, Prokhorov takes issue with the "point to point" calculation of the number of miles driven by class members, which does not capture time actually spent in Illinois including orientation activities or time spent loading and unloading shipments in the state. Prokhorov offers a competing analysis of his pay statements that shows more than half of his deliveries for IIK originated or ended in in Illinois. [157-1] ¶ 2. Three class members also stated that they spent more time driving in Illinois than IIK asserts. Prokhorov testified to spending approximately 30% of his time driving for IIK in Illinois, Anatoliy Radchuck spent 10% of his time driving in Illinois, and Anthony John George drove in Illinois approximately once a week. [161] ¶¶ 4–6.

Different methodologies used by the parties to calculate mileage or hours worked in Illinois or the conflicting testimony by drivers may create an issue of fact on exactly how much work was performed by drivers in Illinois, but that dispute is not material to determining whether the Act applies. IIK does not provide evidence that there are class members who performed *no* work in Illinois—a category of workers that would be barred by *Glass*. IIK suggests that "it is possible that the class

includes members with no connections to Illinois, who must be excluded," [141] at 17, but makes no supported assertion.[22] Because class members performed *some* work in Illinois, I find that there is no risk of extraterritorial reach, and the Act applies.[23]

For these reasons, I also deny IIK's and Kazniyenko's motion to decertify the class in the alternative. IIK argues that the class fails to satisfy Rule 23(b)(3)'s predominance requirement. *See* [141] at 16–18; [160] at 9–10. It says that determining whether the Act applies to class members requires an individualized inquiry of each driver's mileage in Illinois, which would defeat predominance. For a class to be certified under Rule 23(b)(3), the questions of law or fact common to class members must predominate over any questions affecting only individual members. Fed. R. Civ. P. 23(b)(3). "[A] common question predominates over individual claims if 'a failure of proof on the [common question] would end the case' and the whole class 'will prevail or fail in unison.'" *Bell v PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 378 (7th Cir. 2015) (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460

---

[22] Defendants point out that the court in *Watts* distinguished its decision from *Glass*, which was decided on summary judgment with the benefit of a developed factual record. 2018 IL App (1st) 170201, ¶ 30. But defendants, who cross-move for summary judgment on this issue, do not cite to the record to show that there are class members who performed no work in Illinois.

[23] Prokhorov also argues that the Illinois choice of law provision contained in the independent driver agreements or Illinois choice of law principles provide an independent basis for the Act's application to class members. [147] at 6–9. This is incorrect. The rights of employees and the duties of employers are statutory in nature—they do not originate in contract. *See Johnson v. Diakon Logistics, Inc.*, 44 F.4th 1048, 1052 (7th Cir. 2022), *reh'g denied*, No. 21-2886, 2022 WL 4290757 (7th Cir. Sept. 16, 2022) ("The Act governs payment for work in Illinois regardless of what state's law governs other aspects of the parties' relations."). Choice of law principles do not bear on whether class members are covered under the Act. This is not to be confused with the Act's limitation of an employee's recovery to what an underlying contract or agreement provides for. *See* 820 ILCS 115/2.

(2013)). IIK's "randomly sampled" data offered at this stage does not provide new evidence that predominance is no longer satisfied. As discussed above, individualized determinations of class members' mileage or hours are not necessary to answer the question of the Act's application to class members.

### 2. *Employee or Independent Contractor*

Prokhorov moves for summary judgment on the classification of class members as employees under the Act. IIK says it is plaintiff's burden to show that class members are not employees, *see* [151] at 11, but it confuses the burden of the party moving for summary judgment under Fed. R. Civ. P. 56(a) with the burden of proof for the party claiming the independent-contractor exemption under the Act. Summary judgment is appropriate where the nonmovant fails to "meet the burden as to even one essential element (if the element is one upon which the nonmovant will bear the burden of proof at trial)." *Figueroa v. Evangelical Covenant Church*, 879 F.2d 1427, 1430 (7th Cir. 1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Under the Act, the burden of proof lies with the employer to establish that the independent-contractor exception applies and that the worker is not entitled to wage protections. *AFM Messenger Serv.*, 198 Ill.2d at 397–98. And the test for determining whether a worker is an independent contractor is conjunctive—if even one element is not satisfied, the worker is classified as an employee under the Act. *Id.* This means that if Prokhorov shows there is no dispute of material fact as to one element of the test and IIK (as the nonmovant and employer) does not establish a material dispute

18

as to that essential element, then summary judgment is appropriate on the issue of employee classification.

The parties chiefly contest the application of the second element of the test. The second element applies to somebody "who performs work which is either outside the usual course of business or is performed outside all of the places of business of the employer…" 820 ILCS 115/2. This element is satisfied if IIK can show that either condition applies. *Novakovic v. Samutin*, 354 Ill.App.3d 660, 669 (1st Dist. 2004). An employer's usual course of business does not extend to services that are "merely incidental." *Carpetland U.S.A., Inc. v. Illinois Dep't of Emp. Sec.*, 201 Ill.2d 351, 386 (2002). For example, in a limousine business, "the services of chauffeurs are provided in the usual course of business because the act of driving is necessary to the business." *Id.* (citing *O'Hare-Midway Limousine Serv., Inc. v. Baker*, 232 Ill.App.3d 108, 113 (1992)). An employer's place of business extends to any location where workers are representing the business's interests. *Id.* at 391. In a case involving delivery drivers, the Illinois Supreme Court found that the place of business included the delivery route itself. *See id.* at 390 (interpreting *Rozran v. Durkin*, 381 Ill. 97, 98 (1942)).

There's no dispute that class members worked for IIK by driving trucks. *See* [151] at 12. IIK asserts that "[w]hile drivers are necessary for IIK's business, they are not its cornerstone" because the role "belongs to brokers, who route business to IIK for IIK drivers to execute." [151] at 13. There's no requirement under the Act that workers must be the "cornerstone" of the defendant's business to perform work within its usual course of business—courts merely distinguish situations in which an

19

individual performs services that are merely incidental to a business's operations (and therefore outside of its usual course of business) with necessary services. *See Novakovic*, 354 Ill.App.3d at 974. There may be many different roles at a company that all contribute to its usual course of business. Here, drivers are necessary for IIK's business, which by its own admission is to provide freight-delivery services. *See* [148] ¶ 1. And truck drivers perform work in IIK's usual course of business because "the act of driving is necessary to the business." *See Carpetland*, 201 Ill.2d at 386.

IIK's place of business is not limited to its offices in Illinois. In cases involving delivery services, courts routinely recognize that the place of business is not limited to a company's home office(s) given the nature of the work. *See In re Fedex Ground Package Sys., Inc. Emp. Pracs. Litig.*, No. 3:05-MD-527RM, 2010 WL 2243246, at *2–6 (N.D. Ind. May 28, 2010) (collecting cases). That drivers only make "brief appearances" at a business's office to load their trucks is not a dispositive factor. *See Carpetland*, 201 Ill.2d at 389–90. IIK attempts to distinguish this case because it is an Illinois business that provides interstate and international trucking services, not merely intrastate services like the drivers found to represent the interests of the company while delivering packages in *Costello v. Beavex*, 303 F.R.D. 295 (N.D. Ill. 2014), *rev'd on other grounds*, 810 F.3d 1045 (7th Cir. 2016) or *In re Fedex Ground Package Systems*. *See* [151] at 13–14. This distinction between interstate and intrastate delivery routes is unsupported by the law. IIK's place of business extended to the delivery routes that drivers took regardless of whether those routes crossed state lines.

There is no material dispute of fact as to the second element of the independent-contractor exemption—class members were truck drivers who performed work in IIK's usual course of business (freight delivery), and they did not perform work outside of IIK's place of business (which includes delivery routes). So, class members cannot be classified as independent contractors under the Act; they were IIK's employees (even if drivers had their own companies and exercised control over how they drove). This alone is sufficient to grant plaintiff's partial motion for summary judgment. *See AFM Messenger Service*, 198 Ill.2d at 283; *see also Costello*, 303 F.R.D. at 311 (granting summary judgment for plaintiffs-employees where employer failed to dispute the second element of the independent-contractor exemption).

### 3. *Unauthorized Deductions*

IIK contends that even if the Act applies and class members are properly classified as employees, it did not violate the Act because any deductions were either consented to in writing or the deduction was to the benefit of the drivers. [141] at 12. The statute provides an exception for deductions "made with the express written consent of the employee, given freely at the time the deduction is made." 820 ILCS 115/9(4). The Illinois Department of Labor's regulations state that, Ill Admin. Code tit. 56, § 300.720 (2014):

> a) Any written agreement between employer and claimant permitting or authorizing deductions from wages or final compensation must be given freely at the time the deduction is made. In the case of cash advances, the agreement may be made either at the time of the deduction or at the time of the advance itself.

> b) When a deduction is to continue over a period of time and the written agreement provides for that period of time, provides for the same amount of deduction each period and allows for voluntary withdrawal for the deduction, the agreement shall be considered to be given freely at the time the deduction is made.

The agency amended subsection (b) of the provision to add: "No agreements for a defined duration of time shall last longer than six months." *See* Ill Admin. Code tit. 56, § 300.720(b) (2023). The 2023 amendments are not applicable here. *See generally Perry v. Dep't of Fin. & Pro. Regul.*, 2018 IL 122349 (presumption against retroactive application of amended statutes).

There were seven deductions mentioned in the independent driver agreements: an escrow deposit, log book deficiencies, paperwork deficiencies, vehicle damage, vehicle maintenance, insurance deductibles, and other fines and penalties. [148] ¶¶ 13–16, 19–26. Prokhorov does not dispute that the signed agreements included provisions for these deductions, but he disputes that the drivers consented to the deductions via written agreement at the time the deduction was made. He says that IIK did not give prior notice before deducting an amount from drivers' paychecks. [147] at 11. For example, the agreement stated that charges could be deducted for damages to a vehicle's tire. [148] ¶ 19. In 2019, IIK deducted $1,060.14 from Prokhorov's pay (in three installments) to reimburse itself for damages to the tires caused by frozen brake pads and $330.75 to replace additional tires related to the damage by the frozen brake pads. [148] ¶ 20. Prokhorov was never separately notified by IIK about the deductions. It is not sufficient that the signed agreements contained provisions generally describing types of deductions that could be taken from a driver's pay. The Act requires written consent at the time a deduction is made. In this

22

example, the appropriate time would have been when IIK decided to deduct the specific amounts to repair damages caused by the frozen brake pads from Prokhorov's pay.

IIK argues that the Act permits recurring deductions, so an employee does not need to consent to every deduction on a paycheck-to-paycheck basis. [160] at 8. Under the 2014 regulations, § 300.720(b) provides that ongoing deductions are freely given if a written agreement provides: the period of time that deductions will occur, the same amount each period, and the option for voluntary withdrawal. Ill Admin. Code tit. 56, § 300.720(b) (2014). But there's no indication that the deductions at issue here were recurring within the meaning of the Act—IIK did not deduct funds on a regular basis. It only deducted funds if the drivers violated some condition, like proper vehicle maintenance, that was outlined in the agreement.

Even if the deductions contained in the independent driver agreement can be categorized as ongoing or recurring deductions, the agreement provides no notice about the duration of the deductions, the amount of the deductions, or an option for voluntary withdrawal. IIK cites to *Bell v. Bimbo Foods Bakeries Distribution, Inc.*, No. 11-CV-03343, 2013 WL 6253450 (N.D. Ill. Dec. 3, 2023), as an example where the court found an employer did not violate the Act even though deductions varied in amount because a recurring deduction was authorized in a prior agreement.[24] *Bell* is

---

[24] IIK also cites to *Osorio v. The Tile Shop, LLC,* No. 15-CV-15, 2016 WL 316941 (N.D. Ill. Jan. 27, 2016), as another example in which the court found a recurring deduction did not violate the Act. *Osorio* involved a Pay Plan Policy where the employee "knew exactly how much of each paycheck he would be required to give up if he received subsidies in earlier pay periods." 2016 WL 316941, at *2. The Seventh Circuit held in *Osorio v. The Tile Shop, LLC,*

distinguishable because there was no dispute that a signed agreement authorized the employer to make weekly deductions of $56.88 for computer-related costs from an employee's paycheck. *See* 2013 WL 6253450, at *5. The agreement also contained explicit language that the assignment would continue until revoked in writing by the employee. *Id.* There, the weekly deduction never exceeded the total authorized amount of $56.88, so the court did not take issue with the actual weekly charges varying in amount. *Id.* Here, there is no language in the independent driver agreement providing for any type of deduction schedule, the amount of a deduction,[25] or an option for voluntary withdrawal. Because deductions for log book deficiencies, paperwork deficiencies, vehicle damage, vehicle maintenance, insurance deductibles, and other fines and penalties were not authorized by drivers at the time the deductions were made (or were not deducted on a specific schedule provided by the agreement), a reasonable jury could find that these deductions violated the Act.

One of the deductions listed in the agreement is different than the other categories. The agreement required drivers to deposit $1,000 into an escrow account to cover costs charged to IIK that the driver was responsible for; the deposit would be returned (minus the costs charged) if a driver left after providing the requisite two weeks' notice. [148] ¶ 17. Deduction from this escrow fund would not be a deduction

---

939 F.3d 847, 848 (7th Cir. 2019), that there was no violation of the Act because these were not "deductions" from wages but rather "reconciliations" that determined the employee's wages before other withholdings.

[25] The deduction categories for log book deficiencies, paperwork deficiencies, and insurance deductibles did state possible amounts of deduction (*e.g.*, a $500 charge for the first violation of the log book rules), but the agreements did not state specific deductions for every permutation nor did it mention the duration or schedule of such deductions.

from a "wage" under the meaning of the Act. "Wages" include "any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties." 820 ILCS 115/2. The escrow deposit was not owed by IIK to drivers as compensation for any work; it functioned as a security deposit so that IIK was not left on the hook for a driver's unpaid infractions. But Prokhorov says that in practice, deductions were taken from drivers' paychecks without prior notice and authorization.[26] There's a dispute of material fact here. If costs that should have been charged to the escrow fund were taken out of paychecks, then deductions were taken from the drivers' wages and IIK was required to comply with the Act in making those deductions.

IIK contends that drivers authorized two deductions through separate written agreements: the Drivers Legal Plan and the occupational accident insurance. [141] at 14. The Drivers Legal Plan provided drivers with access to lawyers who would help them resolve tickets and other traffic issues at a set cost of $2.98 per week. The Drivers Legal Plan stated that a $2.98 weekly deduction would be made from the driver's earnings and permitted voluntary withdrawal by writing. [148] ¶¶ 27–28; [140] at 881. This was a valid ongoing deduction under the Act—it stated the period of time for deduction, the amount, and the option for voluntary withdrawal.[27] But IIK

---

[26] Kazniyenko testified the following procedure for the escrow deposit system: "We took from [Prokhorov's] salary $1,000 escrow and keep it. Let's say if the driver want to quit or find many reasons, we keep $1,000 30 days." [140] at 56 (31:13–16).

[27] Prokhorov asserts that the Drivers Legal Plan agreement was a part of a "stack" of papers he was required to sign while onboarding, which left him with no choice to opt out. [148] ¶ 27. IIK asserts that this amounts to a claim of economic duress. [160] at 8–9. To the extent that Prokhorov is arguing that his signature did not constitute consent, he offers no evidence to

also deducted $100 deductible amounts from drivers' pay when drivers used the plan's services for resolving tickets. [148] ¶ 31. The legal plan agreement makes no mention of an additional deductible amount that could be charged to drivers. *See* [140] at 881. As for the additional occupational accident insurance through Zurich American Insurance Company, IIK deducted $40 per month from drivers' paychecks. [148] ¶ 34. The enrollment form included a provision for authorizing monthly deductions equal to the premiums. *See* [140] at 884. But it did not mention additional deductions for tickets under the program, such as the parking ticket IIK deducted from Prokhorov's pay in addition to the $40 monthly charge. [148] ¶ 36. It also did not contain an option for voluntary withdrawal. While both agreements contained some of the requisite information to set up an ongoing deduction, a reasonable jury could find that the actual deductions IIK took from paychecks went beyond the authorization in the agreements and therefore violated the Act.

Two deductions were made from drivers' wages without any written agreement: costs for drug testing and the electronic log device monitoring program. IIK claims these were valid deductions because they were to the benefit of drivers. Section 9 makes an exception for deductions that are "to the benefit of the employee." 820 ILCS 115/9(2). Prokhorov argues that the drug tests and electronic monitoring were for IIK's benefit because they are necessary for IIK to comply with its obligations

---

rebut the presumption that he understood the terms of the agreements and consented to them. *See Paper Exp., Ltd. v. Pfankuch Maschinen GmbH*, 972 F.2d 753, 757 (7th Cir. 1992) ("[I]t is a fundamental principle of contract law that a person who signs a contract is presumed to know its terms and consents to be bound by them.").

as a motor carrier. [147] at 13. The parties also dispute whether the drug tests were actually required by IIK, *see* [148] ¶¶ 46–47, but the inquiry is not about whether the deduction is mandated by the employer or primarily beneficial to them. The provision requires the deduction to be to the benefit of the employee—not the expense itself. A deduction can be to the benefit of an employee if the employer subsidizes costs that the employee would otherwise pay. IIK says that the $10 per week cost of the monitoring service was less than what IIK paid for the service. [148] ¶ 39. But IIK offers no such evidence of a benefit to the employee for the drug tests. It says that IIK "fronted the cost for two drug tests Plaintiff was required to take." *See* [141] at 15. It's not clear what benefit to the employee the deduction provided like the monitoring service where IIK passed along the benefits of a discount to its drivers. Without that evidence, IIK does not prove that the employee-benefit exception applied as a matter of law to the drug test.

Summary judgment is denied for the above deductions, except for deductions for the electronic log device monitoring service, the $2.98 weekly deduction for the Drivers Legal Plan, and the $40 monthly deduction for the occupational accident insurance (excluding additional deductions beyond the scope of charges authorized in the separate agreements).

### 4.  Reimbursements

Prokhorov says that drivers were also forced to pay out-of-pocket for job-related expenses, which were not reimbursed by IIK.[28] [147] at 13–14. IIK does not address this point in their briefs, but the parties raise several factual disputes about reimbursements in their Rule 56.1 statements. [152] ¶¶ 24, 44; [161] ¶ 23. IIK says that it reimbursed Prokhorov and other drivers for necessary costs. It reimbursed Prokhorov for costs including antifreeze, scales payments, road repairs, tolls, parking, fuel, and wipers. [152] ¶ 24. IIK asserts that any costs not reimbursed to Prokhorov and other drivers were because drivers did not submit those expenses for reimbursement. *Id.*

The Act requires an employer to reimburse employees "for necessary expenditures or losses incurred by the employee within the employee's scope of employment and directly related to services performed for the employer." 820 ILCS 115/9.5(a). "Necessary expenditures" are "all reasonable expenditures or losses required of the employee in the discharge of employment duties and that inure to the primary benefit of the employer." *Id.* Employees must submit expenses for reimbursement with documentation within 30 calendar days. *Id.*

The record shows that IIK applied "credits" to drivers' accounts for expenses like tolls, scale payments, and other costs. *See, e.g.,* [140] at 516 (log of "compensation, credits, and reimbursements" made to Prokhorov). Prokhorov asserts that he paid for

---

[28] Because Section 9.5 of the Act went into effect January 1, 2019, claims are limited to IIK's failures to reimburse for work performed on or after that date.

28

expenses like cell phone payments, repair tools, and GPS out of pocket, but there's no evidence that Prokhorov or other drivers submitted requests for reimbursements as required by the Act. [152] ¶¶ 24, 44; [161] ¶ 23. Because there's no evidence in the record of requests made by drivers and reimbursements unfulfilled by IIK, no reasonable jury could find that IIK failed to reimburse employees under Section 9.5.

### C.    Class Decertification

I deny IIK's motion to decertify the class in the alternative. In addition to the predominance issue already addressed, defendants argue that decertification is appropriate because class counsel's conduct demonstrates that they cannot fairly and adequately protect the interests of the class. *See* [141] at 18–19.  On July 24, 2023, I warned plaintiff's counsel that the notice administrator should not be requesting confirmation from opt-outs and that any follow-up contact with opt-outs could suggest that class counsel is engaging in direct solicitation. [104]. Defendants say that counsel continued to contact opt-outs via email after the July order. [148] ¶ 53. I initially addressed the parties' concerns about improper conduct at a hearing on September 21, 2023. [114].

Denial of class certification is proper if "[m]isconduct by class counsel… creates a serious doubt that counsel will represent the class loyally." *Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011). Given the incentives for class counsel to "sell out" the class in favor of attorneys' fees, courts are tasked with monitoring misconduct to ensure class counsel can fulfill its fiduciary duties to class members. *See id.* Unethical conduct that is not prejudicial to the class can still create a serious doubt about the adequacy of counsel "when the misconduct

29

jeopardizes the court's ability to reach a just and proper outcome in the case." *Reliable Money Ord., Inc. v. McKnight Sales Co.*, 704 F.3d 489, 499 (7th Cir. 2013). Plaintiff's counsel admit that they sent out a form email to confirm opt-outs after the July order warning them about improper communication with opt-outs. They explained that the class administrator inadvertently sent confirmatory emails to several opt-outs between July 24 and August 1 to which only one email response was received. Counsel also responded to one opt-out call on July 28. [148] ¶ 53. Because there was no conflict of interest or prejudice to the interests of the class raised by these emails attempting to verify the contact information of opt-outs, I do not find that counsel's behavior creates a serious doubt about their adequacy in protecting the interests of the class. Nor does this conduct jeopardize the integrity of the proceedings—there appears to have been no instance of any individual rescinding their opt-out after counsel's follow-up communications. [122] at 3. While the additional communications with opt-outs suggest a surprising disregard for compliance with my order, counsel's conduct does not rise to the level of a serious ethical breach that requires decertification. *See Reliable Money Ord.*, 704 F.3d at 499 (listing examples of ethical breaches justifying decertification to include class counsel's attempts to bribe potential witnesses or failing to correct false deposition testimony).

## IV.    Conclusion

Defendants 11K Transport's and Sergii Stetsiuk's motion for summary judgment, [132], is granted. The Clerk shall terminate 11K Transport and Sergii Stetsiuk as defendants in the case. Plaintiff's partial motion for summary judgment, [136], is granted. The Act applies to the class and the class members were 11K

Transport's employees. Defendants IIK Transport's and Ivan Kazniyenko's motion for summary judgment, [139], is granted in part, denied in part. Summary judgment is granted in defendants' favor as to three of the deductions (the electronic log device, the weekly charge for the Drivers Legal Plan, and the monthly charge for the occupational accident insurance) and the claim for reimbursements. Defendants' motion for summary judgment is denied as to the other deductions from drivers' paychecks.

ENTER:

_____

Manish S. Shah
United States District Judge

Date: August 7, 2024